UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| ADDISON ALEXANDER, | Civil Action No. 1:13-cv-133 |
| Plaintiff, | Dlott, J. |
| vs. | Bowman, M.J |
| SGT. PAYNE, *et al.*, | |
| Defendants. | |

**REPORT AND RECOMMENDATION**

Plaintiff Addison Alexander, an inmate at the Southern Ohio Correctional Facility, proceeding *pro se* and *in forma pauperis*, has filed a civil complaint pursuant to 42 U.S.C. § 1983. (Doc. 1). This matter is before the Court on Defendants' motion for summary judgment (Doc. 62) and the parties' responsive memoranda. (Docs. 64, 66, 67, 68, 70).

**I.    Background and Facts**

Plaintiff's complaint against the defendants Christopher Payne, John Salisbury, and Jeffrey Hubbard, arises from an incident that occurred on December 8, 2012, when defendants allegedly used excessive force against plaintiff. (*See* Doc. 1, p. 6).

Defendants' motion for summary judgment includes the following facts:

On December 8, 2012, Plaintiff Alexander, was an inmate of the Southern Ohio Correctional Facility ("SOCF"), was called to Defendant Sergeant Christopher Payne's office to discuss a conduct violation he had received. (Doc. 62, Exhibit 1, Use of Force Committee Report and Investigation, Bates p. 2; Exhibit 2, Declaration of Payne, p. 1, ¶3; Exhibit 3, Declaration of Salisbury, p. 1, ¶4). Alexander was escorted by Defendant Correctional Officer John Salisbury. (Doc. 62, Exhibit 1, Bates p. 1,

Exhibit 3, Declaration of Salisbury, p. 1, ¶4). While he was escorted, Alexander was secured with cuffs at his wrists from behind his back, and leg shackles at his ankles. (Doc. 62, Exhibit 3, p. 1, ¶4). The shackles provided about one foot slack at the ankles in order for the inmate to walk. (Doc. 62, Exhibit 4, Declaration of Kaut, p. 2, ¶8). These security procedures were applied as all inmates designated as "4B," which was Alexander's designation, require an escort with cuffs and shackles when taken to a part of a prison different from their housing unit. (Doc. 62, Exhibit 3, p. 1, ¶4).

Accordingly to Defendants, Sergeant Payne's office was located in a section of the prison known as K3-K4 within Unit A. (Doc. 62, Exhibit 2, p.1, ¶3; Exhibit 3, p. 1, ¶4). When Alexander arrived at Payne's office, he was seated in a chair in front of his desk. (Doc. 62, Exhibit 2, p. 2, ¶3; Exhibit 3, p. 1, ¶5). Payne was seated behind his desk. (Doc. 62, Exhibit 2, p. 2, ¶3). Officer Salisbury stood behind the chair that Alexander was seated in. (Doc. 62, Exhibit 1, p. 10; Exhibit 3, p. 1, ¶5). No one else was present in Payne's office. (Doc. 62, Exhibit 2, p. 2, ¶3). Payne started to explain the conduct violation to Alexander. (Doc. 62, Exhibit 2, p. 2, ¶4; Exhibit 3, p. 2, ¶6). Alexander then shouted and stood up, "I have 23 years to do and I will do what the fuck I want!" (Doc. 62; Exhibit 1, pp. 8, 10). Payne told Alexander to sit back down, but he did not. (Doc. 62, Exhibit 1, Bates p. 17; Exhibit 2, p. 2, ¶4). Alexander then began spitting at Payne. (Doc. 62, Exhibit 1, Bates pp. 8, 10, 25; Exhibit 2, p. 2, ¶4; Exhibit 3, p. 2, ¶6). In response, Payne removed a bottle of O.C. spray (oleoresin capsicum, a pepper spray), and sprayed a short burst in Alexander's direction. *Id.*

Plaintiff then began moving abruptly. (Doc. 62, Exhibit 1, Bates pp. 8, 10; Exhibit 2, p. 2, ¶5; Exhibit 3, p. 2, ¶7). Officer Salisbury attempted to grab

Alexander's body from behind him. (Doc. 62, Exhibit 1, pp. 10, 17, 19; Exhibit 2, p. 2, ¶5; Exhibit 3, p. 2, ¶7). Payne got up from his chair, moved to where Alexander was flailing, and also attempted to control Alexander by grabbing ahold of his body. (Doc. 62, Exhibit 2, p. 2, ¶5). Alexander was still resisting Payne and Salisbury's attempts to control him by moving his body around. (Doc. 62, Exhibit 1, Bates pp. 10, 17, 19; Exhibit 2, p. 2, ¶5; Exhibit 3, p. 2, ¶7). In response, Payne and Salisbury then placed Alexander on the floor, face-down, in an attempt to gain more control of him, and to block his spitting. *Id.*

While on the floor, Alexander was still struggling on the floor and moving his body. Payne gave Alexander several orders to stop resisting, but he did not comply. (Doc. 62, Exhibit 1, Bates pp. 11, 15, 25; Exhibit 2, p. 2, ¶5; Exhibit 3, p. 2, ¶7). While in the process of taking control of Alexander, Salisbury activated an alarm in his belt, which sent an alarm for assistance known as a Signal 3, which was broadcasted in Unit A. (Doc. 62, Exhibit 3, p. 2, ¶8).

In response, several correctional officers arrived in the area, including Correctional Officer Carla Phillips, Lieutenant Gary Haywood, and Defendant Correctional Officer Jeffrey Hubbard. (Doc. 62, Exhibit 1, Bates pp. 9, 11, 15, 16, 18; Exhibit 3, p. 2, ¶8; Exhibit 5, Haywood Declaration, p. 1, ¶¶4-5; Exhibit 7, Hubbard Declaration, p. 1, ¶¶4-5). Payne and Salisbury then picked Alexander up from the floor and escorted him out of Payne's office. (Doc. 62, Exhibit 1, Bates pp. 8-11, 15-17, 19, 25; Exhibit 2, p. 2, ¶6; Exhibit 3, p. 2, ¶8; Exhibit 5, p. 1.

Alexander was then held, face-first, against the doorframe of the entrance to the K3 South Bullpen to prevent him from spitting at the Officers. *Id.* Payne and

3

Salisbury held Alexander in that position until Officer Ryan Woodard arrived to assist in escorting Alexander to J2, a segregated unit in SOCF. (Doc. 62, Exhibit 1, pp. 8, 9, 12, 16, 17, 18; Exhibit 2, p. 2, ¶6; Exhibit 3, p. 2, ¶9; Exhibit 5, p.2, ¶5; Exhibit 6, p. 1, ¶4). Woodard relieved Salisbury, and Payne and Woodard escorted Alexander down a hallway known as K-Corridor. *Id.* Alexander was escorted with Payne and Woodard each holding on to one of Alexander's arms in a form of a wrist lock ("Technique 3"), to prevent his movement. (Doc. 62, Exhibit 1, pp. 3, 18; Exhibit 2, p. 2, ¶2; Exhibit 6, pp. 1-2, ¶¶4-5). When Alexander arrived at J2, he was placed in what is known as a strip cage; his clothes were removed in order to determine if he possessed any contraband. (Doc. 62, Exhibit 1, p. 8; Exhibit 2, pp. 2-3, ¶6). A spit sock, a barrier placed over Alexander's head to prevent spitting, was also requested in light of the morning incident. (Doc. 62, Exhibit 1, Bates p. 26).

Alexander was interviewed immediately after the incident by Lieutenant Haywood. Alexander was asked if he would like to make a statement, Alexander responded, "No, Hell no." (Doc. 62, Exhibit 1, Bates p. 13; Exhibit 5, p. 2, ¶6).

Alexander was examined by Nurse Catherine James at 8:40 a.m. (Doc. 62, Exhibit 8, Medical Exam Report, Bates p. 31; Exhibit 9, Declaration of James). In her examination, Alexander stated to Nurse James, "My chin hurts a little bit. Other than that, I'm fine." *Id.* Nurse James determined that Alexander was not in any distress. *Id.* No open areas were noted on his chin, but the nursed noted that there was a possible superficial bruise/scrape on his chin. *Id.* In examining Alexander's body condition, she found that he had exhibited normal vital signs, and that his skin was warm, dry and intact. *Id.* She assessed that there was an alteration in comfort related to the abrasion

4

on Alexander's chin. *Id.*

At 11:50 a.m., a little over three hours later, Alexander visited the infirmary and was examined by Nurse Kathy Joiner. (Doc. 62, Exhibit 10, Medical Exam Report, Bates p. 30; Exhibit 11, Joiner Declaration). Alexander stated to her, "I didn't notice that I cut my chin until after the nurse left." *Id*. Nurse Joiner observed that Alexander had a laceration on his chin approximately 1 inch in length, 1 centimeter in depth and there was no active bleeding. *Id.*

Nurse Joiner contacted SOCF's physician, Dr. Faisel Ahmed, to discuss a further course of treatment. Dr. Ahmed ordered Alexander to be sent by van to the Pike Community Hospital emergency room for further evaluation and treatment that day. (Doc. 62, Exhibit 12, Emergency assessment; Exhibit 13, Interdisciplinary Progress Notes, 12/8/12, 11:50 a.m. entry). At Pike, three sutures were put in place for the chin laceration. (Doc. 62, Exhibit 13, Interdisciplinary Progress Notes, 12/8/12, 3:00 p.m. entry). The remaining suture was removed on December 15, 2015. (Doc. 62, Exhibit 14).

Thereafter, a use of force committee was formed to investigate the incident. Lieutenant Joseph Kaut was the chairman assigned to head the use-of-force committee investigation. (Doc. 62, Exhibit 1, Bates pp. 2-3; Exhibit 4, Declaration of Kaut, pp. 1-2, ¶5). Kaut conducted interviews of Alexander and the staff members that witnessed or were involved in the December 8, 2012 use-of-force incident, which included Payne, Salisbury, and Officer Phillips, Officer Woodard, and Lieutenant Haywood. (Doc. 62, Exhibit 1, Bates pp. 14-19; Exhibit 4, p. 2, ¶6). The committee ultimately found that the force used by Payne and Salisbury was justified and not

5

excessive or inappropriate. (Doc. 62, Exhibit 1, Bates pp. 3-4; Exhibit 4, p. 2, ¶7). The committee found that Alexander refused to obey orders and that his aggressive actions presented a threat and placed those involved in jeopardy. *Id.* The committee further found Alexander had the opportunity to injure staff members. *Id*. The warden approved the committee's findings. (Doc. 62, Exhibit 1, Bates p. 1; Exhibit 4, p. 2, ¶9). Alexander filed an informal complaint on December 9, 2012. (Doc. 62, Exhibit 16, Bates p. 40). The matter was referred to the Use of Force committee. *Id.* Alexander's appeal of this grievance to the institutional inspector was denied, as was his appeal to the Chief Inspector. (Doc. 62, Exhibit 15, Bates pp. 3-4, 1-2).

Plaintiff, however, asserts a totally different version of events.

According to his Complaint, while he was in Payne's office that day on December 8, 2012, Payne reacted violently to Alexander when he requested the officer who charged him with a conduct violation be present.

> "Payne became angry and charged at me from behind the desk and maced me in my face. Then C/O [Hubbard] and C/O Salisbury, who were also present in the office with Payne started to punch me. While I was handcuffed behind my back and feet the same, [Hubbard] and Salisbury threw me to the floor and continued to punch me. Then they picked me up and threw me into some food carts outside the office and busted my chin open. Then later, as it's documented by medical, that I was tooking [sic] to an outside hospital called Pike County Hospital to receive stitches to my chin. Now as the assault continued out into the Hallway, Payne and Salisbury preceded to take me out of the K3 Southside door on my way to the hole, Payne stated to the other officers that came to assist the call for the code (for assistants) that everything was under control. Once we got into the hallway Payne began to bang my head off the wall and was told to stop by another C/O because he was on camera."

(Doc. 1).

Thereafter, Plaintiff filed the instant action. Plaintiff claims that defendant Payne sprayed mace into his face and that defendants Hubbard and Salisbury

6

punched him, threw him to the ground and into a food cart, and beat his head against the wall while his feet were cuffed and his hands were cuffed behind his back. (*Id.*). Plaintiff alleges that his chin was injured in the assault and that he had to be taken to the hospital for stitches. *Id.* As relief, plaintiff requests both damages and injunctive relief. (*Id.*, p. 7). He also states that he has exhausted the prison grievance procedure and has attached documentation to the complaint showing that he did pursue relief through the three-step prison grievance process. (*Id.*, p. 3 & attachments).

Defendants now move for summary judgment, asserting *inter alia*, that they acted reasonably under the circumstances and are therefore entitled to qualified immunity. The undersigned agrees.

**II.    Analysis**

**A. Standard of Review**

A motion for summary judgment should be granted if the evidence submitted to the court demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 24748, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party must demonstrate the absence of genuine disputes over facts which, under the substantive law governing the issue, could affect the outcome of the action. *Celotex Corp.,* 477 U.S. at 323.

In response to a properly supported summary judgment motion, the non-moving party "'is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial.' "

*Harris v. Adams,* 873 F.2d 929, 931 (6th Cir.1989) (quoting *Sixty Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987)). The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Satterfield v. Tennessee,* 295 F.3d 611, 615 (6th Cir.2002); *Little Caesar Enterprises, Inc. v. OPPC, LLC,* 219 F.3d 547, 551 (6th Cir.2000).

If, after an appropriate time for discovery, the opposing party is unable to demonstrate a prima facie case, summary judgment is warranted. *Street,* 886 F.2d at 1478 (citing *Celotex* and *Anderson* ). A principal purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex,* 477 U.S. at 323–24. The moving party need not support its motion with evidence disproving the opposing party's claims. Rather, the moving party need only point out there is an absence of evidence supporting such claims. *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir.1996) (citing *Celotex Corp.,* 477 U.S. at 325). Nor must the Court search the entire record for material issues of fact. *Street,* 886 F.2d at 1479–80. The court need only determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**B. Defendants motion for Summary Judgment**

Defendants' maintain that Plaintiff's claims fail as a matter of law because he suffered *de minimis* injuries and he has offered no objective evidence to support his version of the facts. Defendants further contend that they are entitled to qualified immunity because there was no clear violation of a constitutional right. Plaintiff asks the Court to deny Defendants' motion, asserting that genuine issues of material fact exist thereby precluding summary judgment.

### 1. Qualified Immunity

The Court must first resolve the issue of whether Defendants are entitled to qualified immunity for their actions in this case. *See Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity not only insulates government officials from individual liability for money damages, but from the burdens and expenses of litigation and trial. *Saucier v. Katz,* 533 U.S. 194, 200–201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The doctrine of qualified immunity is intended to balance the following competing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231.

Qualified immunity "'gives ample room for mistaken judgments' by protecting

9

'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs,* 475 U.S. 335, 343, 341 (1986)). *See also Dorsey v. Barber,* 517 F.3d 389, 394 (6th Cir.2008). Qualified immunity applies regardless of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson,* 555 U.S. at 231.

Once a defendant raises a qualified immunity defense, the plaintiff must satisfy a two pronged analysis: (1) taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right, and (2) if a violation could be made out on a favorable view of the parties' submission, was the right clearly established at the time of the injury? *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). In its discretion, the court may initially address either of these questions in light of the circumstances of the particular case before it in resolving an officer's qualified immunity claim. *Pearson,* 555 U.S. at 236–37.

Plaintiff bears the burden of showing that a right is clearly established. *Everson v. Leis,* 556 F.3d 484, 494 (6th Cir.2009). Defendant, however, bears the burden of showing that the challenged actions were objectively reasonable in light of the law existing at the time. *Id.*

In determining whether a right is "clearly established" for purposes of the qualified immunity inquiry, the Court must determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Saucier,* 533 U.S. at 202. This question must be answered "in light of the specific context of

10

the case, not as a broad general proposition." *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (quoting *Saucier,* 533 U.S. at 201). The unlawfulness of the officer's conduct must be apparent in light of pre-existing law. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "If officials of reasonable competence objectively could disagree on the law, immunity should be recognized." *Cameron v. Seitz,* 38 F.3d 264, 272 (6th Cir.1994) (citing *Mumford v. Zieba,* 4 F.3d 429, 432 (6th Cir.1993)).

Summary judgment based on qualified immunity is not appropriate if there is a factual dispute or genuine issue of material fact "involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights." *Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1095 (6th Cir.1992).

*2. Applicable law*

To decide whether Plaintiff has presented evidence of a violation of his constitutional rights, the Court must first determine the source of the claimed right. *Phelps v. Coy,* 286 F.3d 295, 299 (6th Cir.2002). Plaintiff's complaint alleges that Defendants subjected him to excessive force by spraying mace in his face, punching him and throwing him into a foot cart. (Doc. 1). As a result of these allegations, Plaintiff asserts that when he was thrown into the food cart, his chin busted open and he required stitches. Plaintiff's claims implicate the Eighth Amendment prohibition against "cruel and unusual punishments." U.S. Const. amend. VIII; *see also Farmer v. Brennan,* 511 U.S. 825 (1994).

To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that,

when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States and (2) that the deprivation was caused by a person acting under color of state law. *Sigley v. City of Parma Hts.,* 437 F.3d 527, 533 (6th Cir.2006) (citing *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)). Prisoners are protected from the use of excessive force by the Eighth Amendment. *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). The Eighth Amendment standard focuses on the official's "obdurancy and wantonness" and asks "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 319–21.

The test for whether the use of force violates the Eighth Amendment requires a court to determine if the defendant's conduct caused the "unnecessary and wanton infliction of pain." *Moore v. Holbrook,* 2 F.3d 697, 700 (6th Cir.1993) (citation omitted). In other words, [t]o ascertain whether excessive force was used under the Eighth Amendment, the court must determine whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Such a claim has both an objective and a subjective component. The objective component requires that the pain be serious. The subjective component requires that the offending, non-penal conduct be wanton. *Griffin v. Hardrick,* 604 F.3d 949, 953–54 (6th Cir.2010) (quoting *Watkins,* 1996 WL 499094, at *2 (citations omitted).

As the Supreme Court has explained, "whenever prison officials stand accused of using excess physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley;* whether force was applied in

12

a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 6–7; *Wilkins v. Gaddy,* 130 S.Ct. at 1178–1179 ("Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts."). Thus, "'[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated ... whether or not significant injury is evident.'" *Williams v. Curtin,* 631 F.3d at 383 (*quoting Hudson,* 503 U.S. at 9).

### 3. *Plaintiff has failed to establish a constitutional violation*

Construing the facts on summary judgment in the light most favorable to the non-moving party usually means adopting the plaintiff's version of the facts. *Scott v. Harris,* 550 U.S. 372, 378, (2007). However, the Supreme Court clarified in *Scott* that facts must be viewed in the light most favorable to the non-moving party "only if there is a 'genuine' dispute as to those facts." *Id.* at 380, 127 S.Ct. 1769 (quoting Fed.R.Civ.P. 56(c)). In *Scott,* the Supreme Court held that a police officer was entitled to summary judgment on a motorist's claim that the officer used excessive force in ramming his car after a high-speed chase, notwithstanding the fact that the motorist and the officer gave conflicting testimony regarding the events in question. *Id.* at 386, 127 S.Ct. 1769. In *Scott,* the conflicting testimony did not create an issue of fact for trial because the record included a videotape capturing the police chase which clearly contradicted the motorist's contention that he was driving carefully. *Id.* at 379, 127 S.Ct. 1769. As noted by the Supreme Court:

> When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

13

*Id.* at 380, 127 S.Ct. 1769.

Such is the case here.

Notably, Plaintiff claims that his chin was cut open while being slammed into a food cart in the Sallyport. However, the video taken from the K3 South Bullpen/Sallyport does not show him being slammed into any food cart. (Doc. 62, Exhibit 15)[1]. Further, Carla Phillips has sworn that she did not witness this, and she previously attested similarly before the use of force committee investigation. (Doc. 62, Exhibit 1, p. 2, ¶6; Doc. 62-1, Bates p. 15). Notably, Phillips stated that she was coming through her bullpen when she heard a loud noise coming from the Sergeant's office. While running to respond, Phillips stated that Sergeant Payne and Officer Salisbury "were trying to gain control of an inmate on the floor. " (Doc. 62-1, Bates p. 11). She stated the same in her questioning before the use of force committee, and that she saw no one punch Alexander, or ram his head into a food cart. (Doc. 62-1, Bates p. 15).

Moreover, as detailed above, a medical examination of Alexander immediately after the incident indicated that he told the nurse that his chin only hurt a little bit and other than that he was fine; the reported physical injury was an abrasion to his chin.

Plaintiff also claims that Hubbard assaulted him after Payne pepper sprayed him without provocation. In support of this assertion, Plaintiff appears to argue that he did not spit at Payne because no DNA evidence was preserved from his spit. However, as Payne explained in his interrogatories, none of Alexander's saliva

---

[1] Plaintiff accuses defendant of deliberately destroying additional video evidence. However, such evidence was outside the scope of Plaintiff's discovery request. The video evidence requested also depicts a time frame after the incident in question occurred and is therefore not relevant to this action. (Doc. 70, Ex. 1).

14

actually landed on Payne's person, otherwise it would have been turned over to the Ohio State Highway Patrol. (Doc. 62-17, p.2, Bates p. 65). Furthermore, the evidences establish that the use of pepper spray by Payne was a direct response to a noncompliant Alexander, who started spitting at Payne. (See Doc. 62, Exhibit 1, Bates pp. 8, 10, 25; Exhibit 2, p. 2, ¶4; Exhibit 3, p. 2, ¶6).

Given the evidence produced by Defendant concerning the circumstances under which the pepper spray was deployed and the use of force used to control a resisting Plaintiff, the undersigned concludes as a matter of law that Plaintiff has failed to demonstrate either the objective or the subjective elements of his claim. Such evidence, coupled with the relatively minor nature of Plaintiff's injuries, suggests that Defendants force was "applied in a good-faith effort to maintain or restore discipline" and not "maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 6-7. As such, Plaintiff has failed to establish that he suffered a deprivation of any clearly established statutory or constitutional right that a reasonable official would understand violated the same. Therefore, the Defendants are immune from Plaintiff's claims for excessive force and are entitled to judgment as a matter of law.

### III.  Conclusion

In light of the foregoing, the Court **RECOMMENDS** that Defendant Hubbard's motion for summary judgment (Doc. 62) be **GRANTED** and this matter **TERMINATED** on the active docket of the court.

    *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ADDISON ALEXANDER,

    Plaintiff,

  vs.

SGT. PAYNE, *et al.*,

    Defendants.

Civil Action No. 1:13-cv-133

Weber, J.
Bowman, M.J

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).